## Horwitz *versus* Norris.

1. The main intent of a testator should govern, and if possible all parts of his will be made to harmonize with it.

2. The first guide for reading a will is its language, and no words used can be rejected, if they can take effect without violating the rules of law.

3. It is only when clauses in a will are wholly irreconcilable that any one can be rejected.

4. Equality of dispositions by parents to children is to be favored, and doubtful words should be solved to attain it, but inequalities clearly created cannot be set aside.

5. "*Item*" is the usual word in a will to introduce new distinct matter.

6. Horwitz *v.* Norris, 13 Wright 213, explained.

7. The will of Joseph Parker Norris construed, especially as to the survivorship provided for in it.

January 14th and 15th 1869. Before THOMPSON, C. J., READ, AGNEW, SHARSWOOD and WILLIAMS, JJ.

Certificate from Nisi Prius: In Equity: No. 46, to January Term 1867.

This was a bill in which Phineas J. Horwitz and Caroline his wife in her right, Elizabeth Norris, Serrill H. Brown and Adeline his wife in her right, Joseph Parker Norris (3d), Lamar W. Fisher, Caroline Norris (the said Lamar, Caroline Norris, Elizabeth and Joseph being devisees of Annie Fisher, deceased), the said Caroline Norris, Elizabeth, Adeline, Joseph and Annie being children of Joseph Parker Norris, Jr., deceased, were complainants, and Charles Norris and Isaac Norris, trustees under the will of Joseph Parker Norris, deceased, and also in their own right, and George W. Norris and Henry Norris, defendants.

The bill was dismissed at Nisi Prius *pro forma*, and an appeal taken to the court in banc; where the case was argued at January

Term 1868, when a re-argument was directed, and it was ordered that the bill should be amended by making the residuary devisees of Joseph Parker Norris parties defendant. Accordingly the plaintiffs filed an amended bill, adding Mary P. Emlen, a daughter of testator, Louis C. Norris, Joseph P. Norris (4th), and Charles Norris, children of Charles Norris, a defendant in the original bill, who since its filing had died intestate, the said Louis C. Norris being also administrator, &c., of the said Charles Norris, deceased, Elizabeth F. Sergeant, a daughter of the testator, Elizabeth N. Brown, William R. Brown, Debby, late Brown, now the wife of G. Dawson Coleman, Mary Brown, Emily (late Brown), now the wife of Samuel Glover, and Fanny Brown, children of Debby Brown, deceased, a daughter of the testator, Hannah F. Norris, Sarah Pepper, Emily Norris and Ellen Norris, children of the testator, the said G. Dawson Coleman being also administrator of the said Debby Brown, deceased, the plaintiffs and defendants under the bills being all also next of kin or representatives of next of kin of the testator, Joseph Parker Norris the 1st.

The bill was for the partition of certain real estate devised by the testator in trust for his son Samuel, who had died intestate. The plaintiffs alleged in their bill that they were entitled to one fifth part of the interest devised for Samuel. The defendants to the bill, in their answer to the bill and the amended bill, averred that under the limitations in the testator's will the share of Samuel was divisible amongst them alone, to the exclusion of the plaintiffs.

Mary P. Emlen and others, the added defendants in the amended bill, insisted that the share of Samuel on his death lapsed and vested under the will of the testator in his residuary legatees, or if he died intestate of that portion, it vested in his next of kin and heirs at law, of whom they were part; they further averred that neither the plaintiffs nor defendants in the first bill could have partition to the exclusion of these defendants.

The testator died in June 1841, having made his will, which was dated on the 15th day of that month, and leaving a widow, Elizabeth H. Norris. By that will, after making provision for his widow by devise of part of his real estate and an annuity during her life, he further provided, amongst other things, as follows, viz. :—

" Item. I give and devise unto Charles Pemberton Fox and Dr. George Fox, and the survivor of them, and the heirs of such survivor, five full, equal, undivided sixth parts of and in all that my capital messuage or tenement and tract or parcel of land, known by the name of Fair Hill, situate in the unincorporated Northern Liberties, in the county of Philadelphia, bounded, &c., containing about 498 acres, with the appertenances, to hold to them the said

Charles Pemberton Fox and George Fox, and the survivor of them and the heirs of such survivor for ever, in trust to permit and suffer my five sons, namely, Charles Norris, Samuel Norris, Isaac Norris, George W. Norris and Henry Norris, to reside on and occupy, or at their discretion to receive and enjoy the rents, issues and profits thereof, for and during their respective natural lives, to and for their own proper use and behoof, in equal shares and proportions, without impeachment for waste, in such way and manner, however, as that the same or any part thereof shall not become subject or liable to the payment of any of the debts, present or future, of any or either of them my said five sons, and so that no creditor present and future, of any or either of them my said five sons, shall ever be able to take, seize or enjoy the same or any part thereof, they my said five sons during their lives respectively paying equally between them five sixth parts of the taxes of said premises, and of keeping the buildings and fences in tenantable repair, and also five sixth parts of my said wife's annuity.

"And upon this further trust, that he my said son Charles Norris, shall have full power and authority by his last will and testament, to devise and settle one of the said five-sixths parts of the premises aforesaid, called Fair Hill, to and on all and any of his issue lawfully begotten, in such way and manner, and under and subject to such restrictions and limitations, or for such estate and estates, use and uses, as he my said son Charles Norris may deem proper ; and in default of such last will or appointment, then in trust as to that one of the said five sixth parts of the said premises called Fair Hill, to and for the only proper use and behoof of all and every the children of my said son Charles, that shall be living at his death, and the lawful issue of such as may be then dead, and their heirs and assigns for ever, equally to be divided among them, part and share alike, as tenants in common, so always however, that such surviving children of my said son Charles shall take *per capita*, and such issue shall take together in equal parts the share that his, her or their parent would have taken if then living; and if he my said son Charles shall die without leaving a child or children, or a grandchild or grandchildren him surviving, then that one five sixth part of the said premises, called Fair Hill, shall go to and be divided among my said other sons, namely, Samuel, Isaac, George and Henry, or such of them as shall be then living, and the trustees hereinafter mentioned for my son Joseph Parker Norris, junior, in equal parts, so that the then survivors of my said four sons, Samuel, Isaac, George and Henry, shall each take one equal share, and the trustees for my said son Joseph shall take the other equal share thereof, each of which said equal shares shall in such event pass to and vest in the trustees herein appointed, subject to the restrictions and limitations and for the uses herein declared, in like manner as if

the same had been so devised in the first instance, that is to say, the trustees for my said sons Charles, Samuel, Isaac, George and Henry, to take, in trust, for the use of my said sons Samuel, Isaac, George and Henry, in equal parts and for the like uses hereinbefore mentioned, and the trustees for my said son Joseph to take in trust for the like uses that are hereinafter mentioned.

"And upon this further trust, that he my said son Samuel Norris shall have full power and authority by his last will and testament," &c., as in the preceding devise to Charles. There were similar several devises for his sons Isaac, George W. and Henry. He further devised:—

"Item. I do hereby give and devise unto my executors hereinafter named, and the survivors and survivor of them, and the heirs of such survivor, the other and remaining one full, equal and undivided sixth part of and in all and singular my said premises, called Fair Hill, in trust to let and demise the same for the best rent that can be gotten therefor, and to take, collect and receive the said rents, issues and profits thereof, as the same shall become due and payable, and the net annual rents and income thereof, after paying thereout one sixth part of the taxes of the said premises and of all necessary and proper repairs, and one like sixth part of my said wife's annuity, and also all the costs and charges attending the execution of this trust, to pay, apply and dispose of, to and for the maintenance and support and benefit of my son Joseph Parker Norris, junior, for and during all the term of his natural life, in such way and manner however, as that the same or any part thereof shall not become subject or liable to the payment of any of his debts, present or future, and so that no creditor, present or future, of my said son Joseph, shall ever be able to take, seize or enjoy the same or any part thereof; and from and immediately after the decease of my said son Joseph, then as for and concerning the said one sixth part of my said lands, tenements and premises, called Fair Hill, to and for the use and behoof of the child and children of my said son Joseph, born and to be born that shall be living at his death, and the lawful issue of such as may be then dead, and in such parts, shares and proportions, and for such estate and estates, use and uses, as he my said son Joseph by his last will and testament shall direct, limit or appoint; and in default of such last will or appointment, then in trust to and for the only proper use and behoof of all and every the children of my said son Joseph, lawfully begotten, born and to be born, that shall be living at his death, and the lawful issue of such as shall be then dead, and their heirs and assigns for ever, equally to be divided among them, part and share alike, as tenants in common; so always however, that such surviving children of my said son Joseph shall take *per capita*, and such issue shall take together in equal parts the share that his, her or

their parent would have taken if then living; provided, however, that no division of this share of my said Fair Hill estate shall be made among the children of my said son Joseph in any event until the youngest of his children born and to be born shall have attained the age of twenty-one years, but that after the decease of my said son Joseph, the net annual rent or income thereof, after deducting thereout as aforesaid, shall be applied by the said trustees to the maintenance, support and education of the children of my said son Joseph, at their discretion and according to their best judgment, until the youngest of his said children, born and to be born, shall have attained the age of twenty-one years.

"And provided also, and I do hereby further will and direct, that no division of the said premises aforesaid, called Fair Hill, or any part thereof, shall be made in the lifetime of my said wife, or before five years shall have elapsed from and next after the day of my decease, but that during such period or periods the net rents, issues and profits thereof only, after the payment of my said wife's annuity, shall be divided among my said five sons, Charles, Samuel, Isaac, George and Henry, each of them taking one sixth part thereof, and the trustees of my said son Joseph taking the other sixth part thereof for the uses aforesaid.

"And provided also, and it is my further will, that in the division of Fair Hill, a preference shall be given to my said son Charles Norris, of electing to choose and take as his share and allotment, such part, share or allotment thereof upon which the house where he now resides is erected, and any rent that may at my death be due from my said son Charles for the premises occupied by him I do hereby give, remit, release and discharge unto him my said son Charles, so that he shall be and is hereby released and discharged from the payment thereof.  And I further will and direct that he my said son Charles shall and may lawfully use, occupy and enjoy the same premises now occupied by him, free from any and all charge of rent, until the period shall arrive for dividing the said Fair Hill estate, he paying all taxes laid thereon from time to time, and making all necessary repairs and fencing, and in the division of the profits among my said five sons, Charles, Samuel, Isaac, George and Henry, and the trustees for my said son Joseph, the rents, immunities and benefits hereby given and released to and intended for my son Charles shall not be taken into view or considered as part thereof, but he my said son Charles shall have and take a full equal share of the said profits with his said brothers and the trustees for my said son Joseph, after deducting the annuity to my said wife, over and besides the said rents, immunities and benefits hereby given and released to and intended for my said son Charles as aforesaid.

"And provided also, and it is my further will, that in the division of Fair Hill, a preference shall be given to my said son Isaac

Norris, of electing to choose and take as his share and allotment that part, share and allotment thereof upon which the old mansion-house is erected.

"Item. I do hereby give and devise unto the aforesaid Charles Pemberton Fox and George Fox, and the survivor of them and the heirs of such survivor, six full, equal and undivided seventh parts of and in all that my messuage, &c., known by the name of Sepviva, situated in the unincorporated Northern Liberties, in the county of Philadelphia, bounded, &c., * * containing about 155 acres, be the same more or less, also of and in a certain piece of marsh land, situate on the south-east side of the said Gunners' Creek, containing 4 acres and 81 perches, &c., * * to hold to them the said Charles Pemberton Fox and George Fox, and the survivor of them and the heirs of such survivor for ever, in trust nevertheless, to and for the uses and purposes following, that is to say, in trust to let and demise the same from time to time for the best rent that can be gotten therefor, and to collect and receive the rents, issues and profits thereof as the same shall from time to time become due and payable, and after paying thereout six seventh parts of all the taxes and necessary repairs on the premises, and all the costs and charges, if any, attending the execution of this trust, then to pay, apply and dispose of the net annual rents, issues and profits, from time to time, in manner following, that is to say, one equal sixth part thereof into the proper hands of my daughter Elizabeth F. Sergeant (relict of the late Elihu Spencer Sergeant), for and during all the term of her natural life, to and for her sole and separate use and benefit;" * * &c., with similar provisions of a sixth part for each of his daughters, Deborah Brown (wife of William Brown), Hannah F. Norris, Ellen Norris, Sarah Norris, Emily Norris, "in such way and manner however as that the same or any part thereof shall not be or become subject or liable to the payment of any of the debts, present or future, of the said William Brown, the husband of my said daughter Deborah, or of any husband which either of my said daughters may hereafter take and marry, and so that no creditors present or future of any or either of such husband or husbands shall ever be able to take, seize or enjoy the same or any part thereof, and that the receipts of my said six daughters respectively, each for her own respective sixth part, notwithstanding any coverture, or whether covert or sole, shall be good and sufficient discharges for the same.

"And upon this further trust, that each of my said six daughters herein before named shall have full power and authority, whether at the time she be covert or sole, and notwithstanding any coverture, to make her last will and testament in writing, and thereby to demise and settle one of the said seventh parts of the said lands and premises to and on all or any of her issue law-

fully begotten, and in such manner, shares and proportions, and under and subject to such restrictions and limitations, or for such estate and estates, use and uses, as she may deem proper; and in default of such last will or appointment, then, after her decease, one of the said seventh parts shall pass to and vest in her children lawfully begotten, and the issue of such as may be then dead, and their heirs and assigns for ever, equally to be divided among them, part and share alike, as tenants in common; so always, however, that such her surviving children shall take *per capita* and such issue shall take together in equal parts the share that his, her or their parent would have taken if then living; and if any or either of my said six daughters hereinbefore named shall die without leaving lawful issue, then it is my will that such daughter or daughters so dying shall have full power and authority notwithstanding any coverture, or whether covert or sole, to devise and settle, by her last will and testament in writing, her and their several and respective seventh part and parts of the said premises, to and on and among all or any or either of my surviving daughters, and on their or either of their issue, in such manner, shares and proportions, and under and subject to such restrictions and limitations, or for such estate and estates, use and uses as she or they, in her or their discretion, shall see fit to limit and appoint; and in case of no last will or appointment, then her or their respective seventh part and parts of the said premises shall pass to and vest in my surviving daughters and their children respectively, lawfully begotten, and the lawful issue of such their child or children as may be then dead, and their respective heirs and assigns for ever, equally to be divided among them, part and share alike, as tenants in common, such surviving children to take *per capita*, and such issue to take together in equal parts the share that his, her or their parent would have taken if then living.

"Item. I do hereby give and devise unto my executors hereinafter named, and the survivors and survivor of them, and the heirs of such survivor, all the remaining one full, equal and undivided seventh part of Sepviva, and of and in the said piece of marsh land on the south-east side of Gunner's creek aforesaid, in trust to let and demise the same from time to time, for the best rent that can be gotten therefor, and to collect and receive the rents, issues and profits thereof, as the same from time to time shall become due and payable, after paying thereout one-seventh part of all the taxes and necessary repairs on the premises, and all the costs and charges, if any, attending the execution of this trust, then to pay over the said net annual rents, issues and profits, from time to time, into the proper hands of my daughter Mary Parker Emlen, for and during all the time of her natural life, to and for her sole and separate use and behoof, in such way

and manner, however, that the same or any part thereof shall not be or become subject or liable to the payment of any of the debts, present or future, of her husband William F. Emlen, and so that no creditor, present or future, of her husband shall ever be able to take, seize or enjoy the same or any part thereof, and that the receipts of my said daughter Mary Parker Emlen, notwithstanding her coverture, shall be good and sufficient discharges for the same; and from and immediately after the decease of my said daughter Mary Parker Emlen, then as for and concerning the said one seventh part or share of the said Sepviva, and of the said piece of marsh land with the appurtenances, in trust to and for the only proper use and behoof of such person or persons, and in such shares and proportions, and for such estate and estates, use and uses as she my said daughter Mary Parker Emlen, by her last will and testament in writing, or by any instrument in the nature of a last will and testament under her hand and seal, notwithstanding her coverture, shall order, direct, limit and appoint; and in default of such last will or appointment, then to and for the only proper use and behoof of all and every the children of my said daughter Mary Parker Emlen, born and to be born, that shall be living at her death, and the lawful issue of such as shall be then dead, and their heirs and assigns for ever, to be equally divided among them, part and share alike as tenants in common, so always, however, that such surviving children of my said daughter Mary Parker Emlen shall take *per capita*, and such issue shall take together in equal parts the share that his, her or their parent would have taken if then living, and if my said daughter Mary Parker Emlen shall die without leaving a child or children or grandchild or grandchildren living at her death, then to and for the only proper use and behoof of my other daughters, her surviving sisters, and their heirs and assigns for ever, in equal parts as tenants in common: Provided always, and I do hereby further will and direct that no division of the Sepviva estate and piece of marsh land shall be made until five years shall have elapsed from and next after my decease, but that during that period the net rents, issues and profits only shall be divided amongst the devisees thereof in the respective shares and proportions aforesaid."

The testator further authorized the sale of his interest in certain lands in McKean county and other counties of Pennsylvania.

He further provided:—

"Item: As for and concerning all the rest, residue and remainder of my estate, real, personal and mixed, not hereinbefore specifically devised or otherwise disposed of, I do hereby give, devise and bequeath the same, and every part and parcel thereof, unto my executors hereinafter named, and the survivors and survivor of them, and the heirs, executors and administrators of such

[Horwitz v. Norris.]

survivor, in trust as soon after my decease as may be convenient, to bargain and sell and absolutely dispose of all and every or any part or parcel thereof, either at public or private sale or sales in their discretion, and at such time and times as they may deem best and most expedient, for the best price or prices that can be reasonably obtained for the same; and to sign, seal, execute, acknowledge and . deliver in due form of law good and absolute conveyances for the same to the purchaser or purchasers thereof in fee simple, who shall not be bound to see to the application of the purchase-money, nor answerable for the misapplication or non-application thereof or of any part thereof, and by and with the moneys proceeding from such sales, in the first place to pay and discharge all my just debts, and after such just debts are fully paid, then to pay thereout unto my sons Samuel Norris, Isaac Norris and Henry Norris, and unto my daughters Hannah Norris, Ellen Norris, Sarah Norris and Emily Norris, the sum of $5000 to each of them, and after each of them shall have received that sum, then to pay, distribute and divide the balance to and among all my children equally, part and share alike, with the exception of my son Joseph Parker Norris, Jr., who is not to have any part thereof, for that I have heretofore given to him, and lately have been obliged to advance for him, is much more than what otherwise might have been his share of the said balance of this my residuary estate; and in order that this my will may be carried into full and complete execution, and to prevent a forced sale of any part of my residuary estate, I do hereby authorize and empower my executors and the survivors of them, if they shall deem it advantageous and beneficial to borrow such sum or sums of money as they may judge necessary, and for securing the repayment thereof with interest, to mortgage all or any part of this my residuary estate."

He then provided a mode for making partition of his real estate, and appointed his sons Charles, Samuel and Isaac the executors of his will. Letters testamentary were duly granted to them. Charles P. Fox and Dr. George Fox having declined to accept the trust under the will, the Court of Common Pleas of Philadelphia, on the 2d of April 1842, appointed Charles Norris and Samuel Norris in their stead.

The widow of the testator died in January 1861. Joseph P. Norris (2), son of the testator, died in January 1863, leaving a widow Caroline, a son Joseph P. Norris (3) and four daughters, Caroline Horwitz, Annie Fisher (since deceased), Adeline Brown and Elizabeth. Under proceedings in equity in the Supreme Court to January Term 1865, partition was made of the Fair Hill estate, in which one sixth part was allotted to the trustees of Samuel Norris for his life, and after his death for the uses declared by the will. The partition was confirmed May 10th 1866. Annie

Fisher, a daughter of J. P. Norris (2), died on the 30th of May 1866, having by her will given one-third of her estate to her husband Lamar W. Fisher in fee, one-third to her brother J. P. Norris (3) in trust, the other third to her mother for life, after her death to her sister Elizabeth, and if she should die in the lifetime of her mother, to the said J. P. Norris (3).

The plaintiffs alleged the share allotted to Samuel vested on his death in five equal undivided parts, one for each of his four brothers and the other in the children of Joseph P. Norris (2) and their representatives.

The prayer was :—

1. An account of the principal and income of the estate so as aforesaid allotted in severalty as the share of the said Samuel Norris, deceased.

2. That partition and division thereof may be had and made according to the course and practice in chancery, and that the shares to which the complainants are respectively entitled be set out to them in severalty.

3. That the defendants be enjoined from proceeding in any way to make partition and division of the said estate to and among themselves, to the exclusion of the complainants or any of them.

4. For such further relief in the premises as to the court shall seem meet.

*William H. Rawle* and *Henry Wharton,* for appellants (plaintiffs), argued—If the words of the testator's will are to be taken literally,—if, as this court has said in McBride *v.* Smyth, 4 P. F. Smith 249, " in searching for his intent, we are to be confined to what he said,"—then the question is comparatively free from difficulty.

Under the words here as the testator has written them, the only possible argument against the complainants taking, is that, in one sense, there was not, at Samuel's death, any trustee of Joseph, because this court had decided that the trust attempted to be continued by Joseph for his children was bad. This fact *does not affect the construction of the will.* If the testator contemplated a trust for Joseph for life, and for his children after him, the accidental fact that Joseph created an excessive and a bad trust for his children, will not defeat the intention of the testator.

Now this intention plainly appears in the last and concluding lines of this clause: 2 Jarman on Wills 762.

What were the " uses thereinafter mentioned," as to Joseph's share, and what rules of construction are applicable to a limitation thus framed ?

As to the latter, words, in one devise or gift, of reference to another devise or gift, operate to transplant the limitations attached

to the latter to the former, as though they had been again expressly repeated. The maxim *verba relata hoc maxime operantur per referentiam ut in eis inesse videntur* (Co. Litt. 359, a), has been always observed: Roe *v.* Clayton, 6 East 632; Meredith *v.* Meredith, 10 Id. 503; Younge *v.* Combe, 4 Vesey 104. When the testator said " the trustees of my son Joseph are to take Samuel's share for the uses thereinafter mentioned," he meant that " the trustees of my son Joseph are to take Samuel's share for the use of Joseph for life, and after his death, in trust, to maintain and educate his children, till the youngest should arrive at twenty-one years of age."

In default of appointment among his children, by will (an event which has legally happened), the next and last *use* was as much one of the " *limitations* and *uses* herein declared," as was the trust for Joseph himself personally. True, at the death of the latter, the use became a legal estate in the children, so far as his *original* sixth was concerned; but, as to the remainder on Samuel's share after *his* death without issue, *that* could not vest till the death of Samuel. In the mean time it remained purely contingent, and the legal estate was outstanding in the trustees: 1 Sugden on Powers 10, 4 Kent 293. If it were not so, all the tenants for life could, the day after his death, have destroyed the future estates of their own children by fine or feoffment.

To contend that there was no *class* at Samuel's death answering to the description of " trustees of my son Joseph," because that trust ceased as to *Joseph's* original share, at his death, and to apply such an argument *towards the discovery of the testator's intention*, is contrary to every rule of construction of wills. The construction of a will cannot be varied by events subsequent to its execution. This is the 21st of the rules laid down in Mr. Jarman's treatise: 2 Jarman on Wills 745; Atkinson *v.* Hutchinson, 3 P. Wms. 258; White *v.* Warner, 11 East 554, note; Ex parte Earl of Ilchester, 7 Vesey 369; Lewis on Perpetuities 33; 1 Jarman on Wills 233.

If Mr. Norris intended that there should be a trust which should endure for Joseph's children, after Joseph's death, the mere fact that, owing to subsequent events, that trust has failed before Samuel's death, cannot affect the construction of the will. And the case must therefore be viewed as if Samuel had died during Joseph's life, or during the minority of Joseph's children: Morice *v.* Bishop of Durham, 10 Vesey 522; Ellis *v.* Selby, 1 Mylne & Craig 386.

That Joseph's children are to take, the brothers contend would give these children a preference over the children of the brothers.

1. It is immaterial whether this would lead to a result which may be regretted. It is not the duty of a court of justice to search for the testator's meaning, otherwise than by fairly inter-

preting the words he has used: Abbott *v.* Middleton, 7 House of
Lords Cases 68, cited in Hawkins on the Construction of Wills 2;
McBride *v.* Smyth, *supra.*

2. But no such result as the preference of Joseph's children
need arise.

The words "the trustees to take in trust for the use of my son
Charles," mean, "trustees of that part of my estate devised in
trust for the use of my son Charles for life, and after his death,
in trust, for the uses declared concerning the same"—and so with
all the brothers. By this construction, no child of any son of the
testator is excluded from Fair Hill.

If the testator did *not* mean, by the words "trustees of Charles,"
any more "than trustees while Charles lived," Charles and his
brothers would take only *life estates* in Samuel's share. What
would become of the remainder? It must go either—

1. With the residuary estate; or,

2. There is an intestacy as to this estate in remainder.

But it is easy to show that Samuel's share neither fell under the
residuary clause, or became the subject of intestacy.

1. It did not fall under the residuary clause. The trust is to
the executors "in trust *as soon after my decease as may be con-
venient,* to bargain and sell" the residuary estate, and pay the
testator's debts,—then to pay certain pecuniary legacies, and then
to divide the balance equally among all the children, excluding
Joseph. The share of Samuel, dying in 1866, could not, after
life estates in his brothers, form part of the residue.

2. Nor was there an intestacy. An intestacy is always to be
avoided, if possible, and there is not a shadow on which to base
such a result.

No intentions loom more largely through the testator's will than
the differences which he intended between his sons and his daugh-
ters, and between his children and his grandchildren. While he
gave his children but a life estate, he gave his grandchildren a fee
simple.

*G. W. Biddle,* for the added defendants in the amended bill.—
The plan of the will is two-fold, one under the trusts of the Sep-
viva estate for the daughters, the other as to the limitations
over in the Fair Hill property to his sons.

Thus while the testator substituted the children of *deceased
daughters* to take, in place of their mother, a portion of the share
of any *daughter* dying childless, he expressly limited the share of
a *son* so dying among his *then surviving* other *sons* only.

The interest that each of the sons, except Joseph, took in an
original share devised to another, was, by the general plan of the
testator's will, a remainder of his portion of said share, contingent

[Horwitz *v.* Norris.]

upon two uncertain events, ascertainable only at the death of the original devisee of the share:—

1. That the original devisee left no issue living at the time of his death.

2. That the remainder-man should be living at that time.

The separate trust for Joseph Parker Norris, Jr., was created *especially* for him on account of the special circumstances under which Joseph stood, and that, owing to these circumstances, the testator found it necessary to raise up an active trust to protect it from creditors; and, *therefore*, that when, in his limitation over of contingent remainders in each original share, the testator came to the limitation over to *Joseph*, he substituted the words "the trustees of my said son Joseph," in order that the special protection from creditors might extend as well to his contingent interests in his brothers' shares as to that actually by its terms originally vested in him.

If the view of the plaintiffs be adopted, the court must hold the trustees for Joseph in *quasi* existence long after the purposes of their trust have been fulfilled and the property affected by it has, by the decision of this court, passed in legal fee simple to the children of the *cestui que trust* solely for the purpose of catching up portions of the lapsed shares of deceased brothers, so that the benefit of their father's possible survivorship shall always enure to them, to the exclusion of all their other cousins.

No intent of the testator can be extracted from any part of his will, to make a special exception in favor of the children of Joseph, to the whole scope and plan of his will, and to the disadvantage of his other grandchildren, or that would authorize the court to fasten such a meaning upon particular, loose and ambiguous phrases in a will. In Hume *v.* Rundell, 2 Sim. & S. 177, the rule is thus stated: "In the construction of all instruments it is the duty of the court not to confine itself to the force of a particular expression, but to collect the intention from the whole instrument taken together. But a court is not authorized to deviate from the force of a particular expression, unless it finds in other parts of the instrument expressions which manifest that the author of the instrument could not have the intention which the literal force of a particular expression would impute to him. However capricious may be the intention which is clearly and unequivocally expressed, every court is bound by it, unless it be plainly controlled by other parts of the instrument."

If Joseph's children do not take a portion of the share that has lapsed after their father's death, to whom does it go?

It cannot go to the remaining surviving sons, because the share that each one of them is to take is expressly designated. In each of the five clauses of the will the testator limits expressly what each is to take. Each lapsed share is "to be equally divided

10 P. F. SMITH—18

[Horwitz *v.* Norris.]

among my said other sons, Charles, Isaac, George and Henry, or such of them as shall then be living, *and* the trustees hereinafter mentioned," &c.

This, then, is a positive direction, unmistakable in its language as to how the division shall be made.

If the views submitted above be correct, it will follow that the testator has, in the case of Samuel, devised one of these portions to a person upon a contingency which has not happened. Each one, therefore, who, under the provisions of the will, is entitled to his share, will take a part, ascertained as above; one of such parts, however, remains undisposed of by this portion of the testator's will.

It is obvious, therefore, that, if the construction contended for above be correct, the portion of Samuel's lapsed share, allotted to Joseph in the event of his surviving, must either—

1. Go to the residuary devisees; or,

2. To the heirs.

It is clear that it must go to the heirs rather than to either of the surviving brothers, since, in no case, can the heirs be disinherited by doubtful words. It is believed, however, that under the residuary clause nothing can go as under an intestacy, and the residue goes equally among all the children of the testator, except Joseph; this residuary clause therefore carries the fifth of Samuel's sixth of Fair Hill, that Joseph's trustees would have taken in the event of Joseph surviving Samuel, into the residuum. The general leaning of the court is to throw everything into the residuum, if the words be sufficient, and this, it is believed, is the law of Pennsylvania: Patterson *v.* Swallow, 8 Wright 487, recognised in Williams *v.* Neff, 2 P. F. Smith 326.

*Strong* and *Meredith* (whom was *E. K. Price*), for appellees (defendants).—Whether Samuel's share should vest in his brothers, depended while he lived upon two contingencies: 1st, that he should have no child or grandchild to survive him; 2d, that the brother or brothers should be living at that time to take. The second limitation is an *alternative* one; for if the deceased son had left a child or grandchild to take, they would have taken in fee. It could not be a remainder after a fee; but a second contingent remainder, to take place in substitution of the first: Smith's Executory Interests, §§ 649, 544; §§ 128, &c. Each limitation is contingent on the *existence of the described person or persons* to take at the termination of the vested life estate in the testator's son.

Executory interests in real property, which are not contingent on account of the person, descend to the heirs of the persons to whom they are limited, &c., where they die before the contingency

[Horwitz v. Norris.]

happens on which such interests are to vest:" Smith, §§ 743, 248, 281.

But executory interests, which are contingent simply on account of the person, are, of necessity, *untransmissible* executory interests. The mention of sons as survivors of a class to take excludes all, who are not survivors of the class; and we cannot insert words to make additional devisees; or read the will as if it devised over to surviving sons, and " the issue of deceased sons:" Smith, § 744; McBride *v.* Smyth, 4 P. F. Smith 245.

Joseph had no interest in Samuel's share during Samuel's life. The fee remained in contingency until Samuel's death. Joseph could only take, when it should be seen at Samuel's death that he left no child or grandchild; for his taking was an *alternative* condition, ascertainable at Joseph's death.

The only possible interest that could accrue to Joseph was for *his trustees* to take *for him,* upon a special trust, *for his life.* But he could have no life estate after his own death, nor have trustees to hold in special trust for him at all.

The testator must say clearly who his devisee is, and what he is to take, otherwise the heir cannot be supplanted: Faries' Appeal, 11 Harris 29; Hitchcock *v.* Hitchcock, 11 Casey 393; Duffield *v.* Morris, 8 W. & S. 348. The heirs or residuary devisees only fail to get what is expressly devised to others. As the children of none then dead are mentioned to take, in substitution of their father, Joseph's would not, unless so said; and the will must speak plainly to make them *an exception to the testator's plan.*

There are no words substituting the children of Joseph, or of any other son. When Joseph is dead, he has no trustees to take, any more than another brother, then dead, could take. The *intent* brings all the sons to an equality. The trustees existed, and were to take, only for the life of Joseph, upon special trusts, created only because he was hampered by debts. He was not intended to be favored above his brothers. As to the residue of his estate, the testator excludes Joseph, " who is not to have any part thereof, for *that* I have heretofore given to him, and lately been obliged to advance for him, *is much more* than otherwise might have been *his share* of said balance of this my residuary estate." He is only mentioned separately from his brothers because his circumstances demanded a *separate and more special trust* for him for sufficient reasons.

If the will is to have a harmonious construction, and have an equal application as to the families of all the sons, the devise over of a share to the *trustees of Joseph* is to be taken to mean, if he be living *and have trustees;* but if he be dead and have no trustees, and there be no *trust estate in existence for Joseph,* then there are no persons answering the description to take. That

special trust ceased by his death; his share has gone by this testator's will to Joseph's children, absolutely: Horwitz *v.* Norris, 13 Wright 213.

The testator had the absolute power of disposal, and has chosen to give to all his sons the chances of survivorship, as to the one or two shares of sons in Fair Hill, who might leave no issue. Having the right we need not inquire his motive.

The right of Joseph was as much contingent, by the language of the will, on his surviving Samuel as the shares of his brothers were; for if not living at Samuel's death there could be no "*trustees of Joseph*" to take the title and hold it for him: Smith on Executory Interests, § 748.

And if the person who must be living *to transmit*, was not living *to take* at the designated time, and the testator has made no *substitution* of his children in his place, neither can take: Fearne 364; Moorehouse *v.* Wainhouse, 1 W. Black. 638, 364, 371, 373; Luddington *v.* Kime, 1 Ld. Raym. 208.

*So long* as the first remainder is in contingency, the second, which is but its substitute, must be contingent, Fearne 375, never capable of taking effect until the first contingency should be determined; and if that became vested, the other never to take effect: Woolmer's Estate, 3 Whart. 480; Daly *v.* James, 8 Wheat. 495. Though the devise was to devisees and their heirs, the heirs could not take, if the devisees did not live to take first: Smith *v.* Folwell, 1 Binn. 546.

It is true that a devise simply to four brothers by name in common, and one dies in *testator's lifetime*, his share is *lapsed*: Williams *v.* Neff, 2 P. F. Smith 326. There, he and he only was intended to take such fourth; but it would have been otherwise if the *survivors* were to take all.

So a person required to be in life at the death of another person, having first died, takes nothing for himself or others after him, but survivors take all where so intended.

It was devised to the surviving sons or into the residue.

The testator meant the sons living to take as *a class*. Though named, and to take as tenants in common, that is, but by way of specification, who will constitute the class, upon the supposition that all other sons than the deceased will be living; but it is only so *many of those named*, who are the *described persons*, that is, so many of them as shall be living of the *class*, who are to take among them the accruing share. The limitations over of each share thus names all the other brothers, although after the death of any one, his being thus named would not avail to give him any share, because not in the class of the survivors.

They are a class: 1. Because the devise is "among my other sons," as distinguished from daughters, who are the devisees of

Sepviva.   2. They are to be sons "then living," in exclusion of daughters, and of the children of sons and daughters then dead.

To say that Joseph's children should take, because *Joseph's trustees* were to take, is not a consequence nor consistent with the words of the will as they stand, but is a contradiction of them, and would be to favor Joseph's family over those of all his brothers.

There is no gift over to any son's children, of any part of any share of Fair Hill, which is to go over by the death of a son without child or grandchild.

Joseph's children could only get part of such a share by its *first accruing to his trustees;* and that is precisely the case with all the children of all the testator's sons.   It accrues to the trustees of *living sons only*, both for want of words to carry it otherwise and by the consistent and equal interpretation of the will; and children of such sons can duly get a part of an accruing share through trustees who first took for a living father.

The rule of equality did not exist as to Joseph's share; for it was given over neither to his brothers surviving, nor to the children of any deceased, if he had died leaving no descendants.   Of that, his brothers or their issue would have had no reciprocal chance of survivorship, while he and his children, through *his trustees, so long as he lived,* had the chances of taking a proportionate share of any brother who should die before him childless. In this, he and his family were favored with chances of increase by the accruing of shares from his brothers, while they and their children could never gain his share.

That construction is to be made which will tend most to preserve consistency: Redfield on Wills 432; Christie v. Phyfe, 19 N. Y. 344, 348; 3 Id. 538; 3 Barb. 488; 3 Brad. 230; 16 Barb. 412; 13 N. Y. 98; Mutter's Estate, 2 Wright 314.   Trusts last only so long as there is an object: Ralston v. Waln, 8 Wright 279.

If Joseph's children can take no part of Samuel's share, do Charles, Isaac, George and Henry take the whole of it; or will a fifth of it fall into the residue?

The *scheme* of the testator was to preserve Fair Hill in his sons as long as any were in life: allowing the descendants of deceased sons to take only the shares which their father had taken during his life.

If no share is to be set off to trustees for Joseph, the four surviving brothers will take each a fourth of Samuel's.   The testator meant living sons to take the share.

A partial intestacy is contrary to the *intention* of the testator: 2 Redf. 442; Mutter's Estate, 2 Wright 321.   The testator is presumed to intend to dispose of all his property; and to intend

[Horwitz *v.* Norris.]

to name all the objects of his bounty. This testator, it cannot be doubted, so intended, though he may not have been aware that any part of Fair Hill could fall into the residue. A residuary clause does not include all the residue of the testator against its reasonable intent: 1 Redf. on Wills 433; Borton *v.* Dunbar, 6 Jur. N. S. 1128. It is only the share of a last childless son, that by oversight he did not dispose of by the prior provisions of the will, and which is reached by the general intent of the residuary clause, though not thought of as an item of property to pass under it. A residuary clause "is presumed to refer to *other real* and personal estate not before mentioned in the will: 2 Pow. on Dev. 421; Hansell *v.* Hubbell, 12 Harris 245; Neide *v.* Neide, 4 Rawle 75, 82; Schriver *v.* Meyer, 7 Harris 87; Patterson *v.* Swallow, 8 Wright 487; Wright *v.* Horne, 8 Mod. 225, n. *c*; Hawkins on Wills 44; Act of April 11th 1833, § 10, Pamph. L. 249, Purd. 1017, pl. 11.

Here the six sons take as *a class;* and as *a class* the survivors of them, as long as any be left, are to take, whenever a limitation over takes effect in their favor. Although tenants in common, and one of the devisees in common dies before the testator, there is no lapse, but survivors take the whole: 2 Redf. on Wills 505; Jackson *v.* Roberts, 14 Gray 546; Stires *v.* Van Rensselaer, 2 Bradfd. Surrog. R. 172; Stewart *v.* Sheffield, 13 East 526; 4 D. & W. 431; 1 Jarman 295.

When there is obscurity, the embarrassed mind can derive most valuable assistance from viewing the instrument as a whole; from comparing one part with the other, and from ascertaining which of two proposed constructions of the equivocal or disputed item will best effectuate the testator's *general intent.* If one construction manifestly tends to destroy the symmetry of the will, and to produce results inconsistent with the whole scheme of the disposition of his property proposed to himself by the testator, while another harmonizes all his dispositions and accomplishes all his intentions, we may feel reasonably assured that in the latter is to be found the true will of the testator: Earp's Will, 1 Pars. 457–8, affirmed in Supreme Court, 4 Casey 368. The general scope of the will gives Fair Hill to sons, Sepviva to daughters; both originally and in the limitations over.

Words may be supplied to clear up the intent: 1 Jarman 427: and it is a less liberty to transpose a clause unskilfully misplaced, and that may be done (1 Jar. 437) to effectuate the general intent: Covenhoven *v.* Shaler, 2 Paige 122; 1 Redf. on Wills 447, 467; McKeehan *v.* Wilson, 3 P. F. Smith 74. Limitations may be transposed to produce a consistent disposition from the entire will: Mutter's Estate, 2 Wright 321; Linstead *v.* Green, 2 Md. 82; Hawkins on Wills 5.

[Horwitz *v.* Norris.]

*R. C. McMurtrie,* in reply.—A contingency has happened, provided for in the will, and two questions occur:—To whom is the share of Samuel limited; or is it undisposed of. Persons are certainly named who are to take in this event, and the doubt whether they take the fee can arise only, because, the limitations being to sons, or to the trustees for Joseph, no greater estate passes than what they or the trustees had in the shares so held by them. But the limitation is not to the sons, but to their trustees, for though they are named, it is provided the estate shall vest in the trustees. If the limitation over is confined to sons surviving, then the issue of all deceased sons are excluded, for the sons are expressly to take but life estates.

The real question is, whether the estate has vested, and in whom in this particular event. What is the estate that is limited over; it is not the share of the deceased son which was for life only, but the one-fifth of the whole, contingently limited to his issue.

It is assumed, that the parties who are to take are described as sons, or survivors of sons. But this is not so; the shares are to pass to and vest in the trustees for the other four sons, and in the trustees for Joseph. They are not to take for the four only, and for Joseph only, but for the *like uses* as are thereinbefore mentioned. What are these uses, for they define the remaindermen and their estates. They are for the sons for life—for their issue if they have any. The trustees are to take *under the restrictions* and *for the limitations;* thus there are persons named to take—the trustees—and persons for whom they take—the persons who for the time being—they are trustees. The concluding clause cannot be satisfied with less; and the clause respecting survivorship is confined to the estates of the sons, which were intended to be for life only.

It is said the limitation over is confined to sons then living; but there is no such qualification in the limitation to the trustees for Joseph. That is given to his trustees, not for him, but for the *uses of their trust.*

There is then as to his one-fifth of this original sixth, an express devise to trustees, in fee. To narrow that to a life estate for the cestui que trust requires clear words; and it is admitted, the only ground for an implication is an analogy to the devises for the other sons. This would be a remarkable application of an analogy, if there were one; but what analogy is there between several devisees?

But the whole ground fails when the latter clause, *that is to say,* &c., is read; for by that all the equitable estate is disposed of, and the survivorship is confined to the life estates of the sons. The express mode in which this clause is to operate, precludes the application of the earlier clause of survivorship here. For, on the event that has happened, the share of the deceased son is to

[Horwitz *v.* Norris.]

go to the others as in the first instance; *i. e.*, as if this share had been thus given in the first instance—the first taker having died leaving the father. It is a devise substituted for that to the deceased son.

This construction reconciles the whole—the presumption against intestacy; the general intent to confine the whole estate to sons and their issue, as long as any exist; the inconsistency of leaving any part to descend or pass to daughters, while sons or their issue survive.

The stress of the argument is that the trust for Joseph terminated with his life. But the limitation to them is not confined to his life; it is to the persons who hold an estate for his life, for the uses, and subject to the limitations of that trust. To determine the extent, those limitations must be read, and the effect is to give an estate to the same persons as would take the share in which he had life estate. It is exactly so with all the others, the sons are to take for life, but the estate vests in their trustees for all who take their shares in succession.

Unless this be so, Joseph never would have taken had he survived, which they admit he would; or if he did his issue never could, for unless they are included in *the trusts and limitations*, they are not mentioned; and so precisely of the issue of the other sons living or dead.

It is said his trust was a dry one. It was as active as theirs, even after Joseph's death; for theirs had no operation but to preserve the remainders. It is then said that as to Joseph's share his trust terminated by his death, and there was no one to take. But no estate ever failed for want of a trustee when the cestui que trust is certain—was it ever heard that a contingent remainder lapsed because the trust on which it was devised had been turned into a legal estate.

For this a question of intention—not of conveyancing. It is not whether there is no grantee, but who are intended as devisees. And by applying the rule to the other sons this is palpable. For unless their issue take under the description of *uses* and *limita*-tions of their father's trusts, they are not named or described, and the absurd result is arrived at of a limitation on the death of a son without issue to surviving sons for life only.

The truth is, the *trustees for the uses and the limitations* are but a short description of the persons and the estates named in those clauses. If a devise be made to the executor of A. for the uses of his will, and the executor is discharged before the devise takes effect, do those who hold A.'s estate lose the devise by the cesser of the executorship.

This construction is supported by the whole frame of the will. Each fifth is treated as a separate estate, and as if there was a separate will for that. The draftsman got confused in his provi-

[Horwitz v. Norris.]

sion for survivorship to the sons having but life estates, and then adds his gloss which explains the whole. The trustees for the four are to take for them and their issue, and the trustees for Joseph for him and his issue. And the whole is but an awkwardly expressed cross-remainder clause.

The only difficulty lies in holding that accrued shares are to pass with the original: Masden's Appeal, 4 Whart. 441. This would be the necessary consequence of the argument on the other side. For while the devise over to Joseph's trustees is not dependent on his surviving, there is an express declaration that the devise over to the other sons is to such of them as do survive. The explanation is to refer this clause to their enjoyment for life. But however that may be, there is no such condition affecting our share. But where the intent is to keep the whole together, that refinement is avoided: Hawkins 269–70. And this is evidently intended in the clause *as in the first instance.* The effect of this is to give each share on the death of a son without issue, to the same persons who took the other shares as of the date of the testator's death. It is a substitution in place of the son whose line is extinct. And the rule is to read such clauses as if the original was erased and the substitute inserted.

The result is just what a casual reading gives. The sons and their issue are to exclude daughters; the sons are to have life estates, remainders to their issue; in default of issue each share goes to the others, if living, or to their issue if dead; and the trustees are named and used merely to feed and protect those limitations.

The opinion of the court was delivered, May 11th 1869, by

AGNEW, J.—It is a sound rule in the interpretation of wills, that the main intent of the testator should govern, and if possible all the parts of the will be made to harmonize with it. But the first guide for the correct reading of a will is the language used by the testator himself, and we are not at liberty to reject any words he has used, if they can take effect without violating the rules of law. It is only when clauses found in the will are wholly irreconcilable any one can be rejected: Hamm v. Meisenhelter, 9 Watts 351; Sorver v. Berndt, 10 Barr 213; Haldeman v. Haldeman, 4 Wright 34. While equality in the dispositions of property by parents among their children is to be favored, and doubtful words should be solved as far as possible to attain it, we cannot set aside the inequalities which their wills clearly create. Hence, when Joseph Parker Norris provided that if his son Samuel should die without leaving a child or grandchild, his share of Fair Hill should vest in the *surviving* sons named in his will, so that the survivors only should take equal shares, we cannot correct the will by rejecting the words of survivorship, in order to give an equal share to the children of one or more of the sons

named who might die before Samuel. The right of survivorship is plainly conferred not only in this particular clause, twice expressed, but is to be found in all the clauses of the item relating to the five sons named, in language precisely similar, twice expressed, and denoting the same exact thought in each instance. That the children of a predeceased one of the nominated sons are excluded by these terms, clearly and conclusively confining the share to the survivors, cannot be doubted, and is not contradicted by any part of the will. And that this inequality was intentional, and not a mere blunder of the scrivener, derives additional proof from the provision made by the testator for his daughters. He gave to any one of his six daughters named who might die without issue, power to devise her share of "Sepviva" to and among all or *any* or *either* of his *surviving* daughters; and if she left no will he directed her share to pass and vest in his *surviving* daughters and their children. The inequality as to Sepviva is even more glaring than as to Fair Hill.

The same rules of interpretation must be applied to the devise to the trustees of his son Joseph. If the language really confers a share of Samuel's one-fifth on the children of Joseph, we cannot gainsay it, even though it result in an advantage to them not possessed by some of their cousins. Equality can no more override the testator's intent in this case than in the former. That Joseph was placed upon a footing different from that of his five brothers is evident. Before considering the particular devise the subject of this controversy, and as bearing on it, it will be useful to notice some of these differences. The testator devoted to the five brothers one *item* of his will, first creating a single trust for them all, and then by separate but exactly similar clauses, providing severally for each. The next *item* he devotes to Joseph, making the executors of the will (different persons) the trustees for Joseph and his children. *Item* is an usual word in a will to introduce *new distinct matter:* Evans & Wife *v.* Knorr, 4 Rawle 71. It is supposed that this separation in the will of Joseph from his brothers was solely to provide a more strict trust to protect Joseph's estate from his creditors, and not to place him on a different footing as to the estate. This might have been one purpose, but was not the only one. As to creditors, the testator appears to have thought he had effectually protected the shares of the brothers also, for he made for them an ample provision, as he supposed, against their creditors. An additional purpose of the trust for Joseph obviously was to protect him against himself. But this is not the only difference. The power of appointment of Joseph was to be among *all* his children; that of his brothers could be to *any* or all. If any of the brothers died without issue, his share passed to the survivors and the trustees of Joseph; but no provision was made for Jo-

seph's·share in the case of his death without issue. The trust for the brothers ceased at their death with issue, but dying without issue it continued in the common trustees for the survivors, to whom the share passed by the will. The trust for Joseph did not cease at his death with issue, but continued actively in the trustees until all his children should arrive at age. That for these variations of design the testator had his own reasons is corroborated by the provisions for his daughters, to whom he devised Sepviva. For six of them he made similar trusts, yet differing in some aspects from the trusts for his sons, and for the seventh (Mrs. Emlen) a trust entirely different as in the case of Joseph, and yet not following his in the same precise track. In her case the trust ceased actively at her death, while her power of appointment was not confined to children, but extended to the *person* or *persons* she should select. Another difference between Joseph and his brothers was, that they participated in the residue of the estate, while he took none of it. The reason given by the testator was the advancements he had made for Joseph. But if the testator intended as to Fair Hill that Joseph's trustees should always share in the portions of the brothers dying without issue, we cannot gainsay that he intended this in compensation for excluding Joseph from the residue. These differences in provision among his children and variations of purpose admonish us, therefore, not to reject the language of any expressed intent, because it does not conform to our own views of what he should have done. We must, therefore, follow his expressed intent, though we may not be able to divine the inward reason.

Thus we are now brought to consider the provision made for Samuel's one-fifth on his dying without issue. The testator directed that "then that one of the said five sixth parts of the lands, &c., called Fair Hill shall go to and be equally divided among my said other sons, namely, Charles, Isaac, George and Henry, or such of them as shall be then living, *and* the trustees hereinafter mentioned of my son Joseph Parker Norris, Jr., in equal parts." Here then is a distribution clearly expressed—the estate to pass and vest in the *living* brothers *and* in the *trustees* of Joseph. These trustees are by the will the three "executors thereinafter named and the survivors and survivor of them and the *heirs* of the survivor." The testator did not content himself with the single expression foregoing, of his intention as to distribution among the surviving brothers and the trustees of Joseph; or with a single separation of the surviving brothers from these trustees as a party unalterably designated to take an equal share; but he proceeded to add—"so that the then survivors of my four sons, Charles, Isaac, George and Henry shall *each* take one equal share, and the *trustees* of my said son Joseph shall take the other equal share thereof." It is not possible for language more dis-

[*Horwitz v.* Norris.]

tinctly to set apart by themselves the recipients of Samuel's fifth; the surviving brothers on the one hand, and the trustees of Joseph on the other. Nor is it possible for language more clearly to take the trustees out of the class to which survivorship attaches. The testator says so in almost so many words. With the idea of survivorship directly in view, and the thought pressing itself out into words, he says survivorship shall attach to the four brothers named, while the other share shall vest in a single body made permanent by descent to the heirs of the survivor; to wit, the trustees representing a single ownership. The very character of the body and the separation of their share, therefore, forbid the idea that it is subject to survivorship as are the shares of the brothers. But if the testator meant that this share should be contingent on the death of Joseph, it is singular he did not place Joseph in the same category with his brothers. In answer to this it is said that the form of expression—"trustees of Joseph"—is a mere periphrasis for Joseph himself, adopted to preserve his interest from his creditors, who might have seized it if devised directly to himself. The best reply to this is that found in the will itself, which continuing after the last quotation, proceeds to say : "Each of which said equal shares shall pass to and vest in the trustees herein appointed, subject to the restrictions and limitations, and for the uses herein declared, in like manner as if the same had been so devised in the first instance ; that is to say, the trustees for my said sons Charles, Samuel, Isaac, George and Henry, to take in trust for the use of my said sons Charles, Isaac, George and Henry, in equal parts for the uses hereinbefore mentioned, and the trustees for my said son Joseph to take in trust for the like uses that are hereinafter mentioned."

Thus the testator carefully provided that the shares accruing to the surviving brothers, as well as that for Joseph, should vest, not in themselves, but in their respective trustees, for the like uses as the original shares. Therefore, had the share of Joseph been given to him in the same direct language as those given to his brothers, it would have been equally protected from creditors with the original share devised to him; for, by the express provision following immediately the devise of the accrued share from Samuel, it was made to vest in his trustees, subject to the same restrictions and limitations, and to the same uses expressed in relation to the original share. The testator had, therefore, no such reason as has been attributed to him, for separating the devise for Joseph from that to his brothers, but must have had other reasons beyond the person of Joseph merely, and extending to his family. These reasons can be discovered, partially at least, by noticing two facts : the first, that he did not subject Joseph's share to the same rule applied to his brothers dying without issue ; the second, that the trust for Joseph was not to cease at his death

with issue, as in the case of his brothers, but was to continue actively for the benefit of all his children, until the youngest should arrive at age. It was the evident purpose, therefore, of the testator, in thus separating the devise of this one share from the others to the surviving brothers, to vest this share in the trustees of Joseph for the entire purpose of the trust; which was expressly created for Joseph's children after his death, as well as for himself while alive. This is not a matter of inference; but is clearly stated by the testator himself when he says, that the trustees of Joseph shall take this share for the like uses that are hereinafter mentioned. These uses cover the whole trust, which by its express terms includes a trust for the children until the youngest attain majority. This is an answer also, and the best that can be given, because it comes from the mouth of the testator, to the somewhat hypercritical statement; that the trustees of Joseph *living* are not the trustees of Joseph *dead*. Certainly they are not; but they are trustees of the estate committed to their charge for Joseph alive, and for the children of Joseph dead; and we must not suppose the testator meant to indulge in the same curious vein of thought as to Joseph alive and dead, when we perceive that he created a trust expressly for his children after his death, and distinctly directed this share to vest in the trustees for the same uses, as though it had come to them originally. It is in vain to dispute an intention so unambiguous, and so clearly defined, not only by the separation of this share from all the others, but by vesting it in trustees in terms coextensive with the whole trust committed to their charge. We cannot substitute our own notions of right or fitness for the clearly expressed will of the testator. For the same reason the argument cannot prevail, which treats the shares of Samuel's part as vesting in the *trustees* of his *surviving* brothers, for the use of the children of any one of the four who might have died before Samuel. It cuts out of the will and leaves out of view the very clause which precedes and qualifies it, by vesting in *each* of "*the then survivors* of my four sons Charles, Isaac, George and Henry" "*one equal share.*" By the express terms of the succeeding clause, it is "*each* of which *said equal shares*" which "shall pass to and vest in the trustees herein appointed." The argument makes the use repugnant to the preceding distribution, by giving to the children of a deceased son that which had been specifically vested in the survivors only, by two distinct declarations of the same intent. This would be simply to strike out of the will what is in it, and to put there what is not. Nor should we be carried away by a dramatic array of figures. The will of Joseph Parker Norris, made in 1838, is not now to be interpreted by the changes produced by the accumulated wealth of thirty years of rapid progress poured into the lap of a

great city; or by the strides that city has taken toward Fair Hill, almost embosoming it within her built-up limits. If, by the accidents of life, and the alternations of events unforeseen by Mr. Norris, these changes should bring to the children of Joseph Parker Norris, the son, by this interpretation of his father's will, property worth a million of dollars or more, it furnishes no argument against the plain meaning of language used thirty years ago, by one then unconscious of these great changes. We are not now to assume for him the character of a seer; or, to suppose he must have indulged in the prophetic spirit now sought to be applied to the interpretation of his will. The meaning it then had is the meaning it now has. If, therefore, the life of Joseph Parker Norris was so prolonged that his children had all grown to majority before his death, rendering the trust for them of the original share no longer necessary to survive, their right to the estate since fallen in from Samuel under this interpretation of the will does not therefore lapse. For this purpose, and to pass the title, the trust will still exist, though but for the instant necessary to carry it over to them. This is not inconsistent with Horwitz *v.* Norris, 13 Wright 213. That case merely decided that Joseph's appointment of his original share fell without the power contained in his father's will, and that that share vested in his children under the terms of his father's devise. It was in reference to this original share Justice Strong remarked, that the estate of the children was legal, all then being of age. But as to the shares of Samuel since accruing, the trust may be considered to still exist as a *scintilla juris* to pass the estate; or, if necessary, the estate may be held to pass directly to themselves as now standing in the room of the trustees, whose active duties have ceased. In whatever way the devise may be supposed to operate, it is very certain that the will of the testator will not be permitted to fail by the transitory character of the trust.

In conclusion, our opinion is, that Samuel's share on his dying without issue vested in his surviving brothers Charles, Isaac, George and Henry on the one hand, and in the trust created for Joseph and his children on the other; and that this intention on the part of the testator is so clearly expressed, we are not at liberty to reject the language creating survivorship among the brothers on the one side, or that which on the other side vests a share in the trustees of Joseph to the whole extent of their trust, and therefore includes his children and himself.

It follows from these views that the *pro formâ* decree made at Nisi Prius must be reversed, and a decree entered for the complainants in conformity with the interpretation given by us to the will of Joseph Parker Norris. Let a decree be drawn up accordingly.

[Horwitz v. Norris.]

Concurring opinion of

SHARSWOOD, J.—I concur in the decree in this case. But I do not concur in the construction of the will of Mr. Norris, which in any event will give a preference to the descendants of his son Joseph over those of his other sons. I think his intention to make them all equal abundantly appears. Wherever a general plan or design is clearly manifested, expressions carelessly or inartificially introduced, which are inconsistent with it, ought to be disregarded. That general design in this instance was that "Fair Hill" should go to his sons and their descendants, and "Sepviva" to his daughters and their descendants. Subject to the power of the first takers to discriminate among their children, he meant that this descent should be to all *per stirpes*. Courts indeed are always loth to reject any words which can take effect, but it has been repeatedly done wherever it was necessary to carry out the main purpose. "It has been an established rule in the construction of wills," says Mr. Jarman, "that where two clauses or gifts are irreconcilable so that they cannot possibly stand together, the clause or gift, which is posterior in local position, shall prevail, the subsequent words being considered to denote a subsequent intention: *Cum duo inter se pugnantia reperiuntur in testamento, ultimum ratum est:*" 1 Jarman on Wills 411; Lewis's Estate, 3 Whart. 162; German v. German, 3 Casey 116; Stickle's Appeal, 5 Id. 234. "It is clear, however, that words and passages in a will, which are irreconcilable with the general context, may be rejected, whatever may be the local position which they happen to occupy; for the rule, which gives effect to the posterior of several inconsistent clauses, must not be so applied as in any degree to clash or interfere with the doctrine, which teaches us to look for the intention of a testator in the general tenor of the instrument, and to sacrifice to the scheme of disposition so disclosed, any incongruous words or phrases which have found a place therein:" 1 Jarman 420.

The testator in this case has explicitly directed, as I read it, that on the death of his son Samuel without leaving children or grandchildren, his one sixth part of Fair Hill "shall pass to and vest in the trustees herein appointed, subject to the restrictions and for the uses herein declared in like manner as if the same had been so devised in the first instance:" that is, as if there had been no trust for Samuel and his issue, but the estate had been originally devised only in trust for the other sons and their issue: "for the uses therein declared," that is, for their children and grandchildren equally, if they make no appointment, as well as for themselves. Had Fair Hill been so devised in the first instance it is unquestionable that upon the death of each son, his children and the issue of his deceased children would have succeeded to his share. Mr. Norris was very careful to provide that his great-

. [Horwitz *v.* Norris.]

grandchildren should succeed to their parents' shares respectively, and that as to the accrued as well as the original shares. But to make his intention more plain it is added by way of explanation: "that is to say, the trustees for my said sons Charles, Samuel, Isaac, George and Henry (namely, Charles Pemberton Fox and Doctor George Fox) to take in trust for the use of my said sons Charles, Isaac, George and Henry in equal parts, for the uses hereinbefore mentioned, and the trustees for my said son Joseph (namely the executors of his will) to take, in trust for the like uses that are hereinafter mentioned." It is remarkable that he does not say in trust for the survivors of my said four sons, or that the trustees of such of them as shall be then living shall take. To assume the power of inserting such words here seems to me as bold an exercise of construction as to strike them from the previous clause. Here is a prior clause inconsistent with a posterior one, and inconsistent with the whole tenor of the instrument. It occurs to me as quite probable that the scrivener in employing in that previous clause the phrases "such of them as shall be then living," and "the then survivors of my said four sons," had reference merely to the fact that the sons were to take for themselves only life estates, and that therefore such as were dead could not properly be named to take the accrued shares; but that he did not mean to exclude the subsequent estates limited to the children and their issue; and these phrases are therefore not repeated when he comes in the following clause to provide that the accrued share shall pass to the trustees in the same manner and on the same uses as the original shares. To attribute to these words an overruling effect in the construction of the will is to render Mr. Norris's scheme of disposition inconsistent, incongruous and capricious. Such an effect is never to be given where it can be avoided. The courts will lay hold of any expressions which indicate a contrary intention. It is to exert an astuteness not to effectuate but to defeat the general design, to argue that upon the death of the sons respectively the several trusts as to their respective shares ceased to be active trusts. If this were so and the trustees of Joseph, in the case which has occurred, cannot take because in law there are no such trustees, then, inasmuch as Joseph is not named in the clause in which survivorship appears to be provided, but the accrued share is expressly limited to "the then survivors of my said four sons Charles, Isaac, George and Henry, and the trustees of Joseph," it would follow as a logical consequence, that Joseph's share would fall into the residue as a part of the estate devised to persons not *in rerum natura,* and therefore undisposed of (1 Jarman 587), or descend to the heirs at law. But if the testator knew of such a technical rule, which was by no means well settled at the date of the will, he seems to me to have used language broad enough to forestall its

[Horwitz v. Norris.]

application; for he has declared that in the event of the death of any one of his sons without leaving issue, his one-sixth shall go as it would have done, if it had been originally included in the devise, to the trustees in trust for the benefit of the others only, Charles, Isaac, George, Henry and Joseph, without naming Samuel, the one dying childless.

Such is my interpretation of this will. I cannot pretend that I have confidence in it, because it is opposed to the views of a majority of the court. But I am so strongly persuaded that it is the real mind of the testator, that I am bound to express it. It renders his whole scheme of disposition consistent, equal and just, and saves him from sinning in his grave, which any man in my estimation does, who makes an unequal distribution of his property among his children or grandchildren, without some good reason for it. Upon the construction as now placed by the court upon this will, it will follow that among the descendants of Mr. Norris—all with an equal share of his blood in their veins—most of whom he had never seen, and never could expect to see—without even distinguishing between those who should and those who should not bear his honored name—expressing as to his sons from whose loins they were to spring no preference of one over another—he is yet made arbitrarily and capriciously to include some and exclude others. If it can be supposed that Mr. Norris intended that, although on the death of Samuel his son Charles should take an equal share of that one-sixth for his life, which on his death should remain to his children then living and the issue of such as might then be dead, but that Charles being deceased, if Henry should die without issue, these same children should take nothing of their uncle's share,—it appears to me very much like throwing his estate in the dark, to fall where by chance it might. Still more incongruous and capricious does it seem in my judgment that while the children of Charles in such an event are to be excluded, the children of Joseph, also deceased, should be admitted, and that if Henry should survive all his brothers, and die without issue, his share shall go to the children of Joseph, to the exclusion alike of the children of Charles, Isaac and George. I would labor with all the little astuteness I possess to escape from such a conclusion. I cannot for a moment believe that Mr. Norris ever could have anticipated this result, or that if it had been explained to him he would not have indignantly repudiated it. He evidently expected that Fair Hill would become a part of the city—would greatly increase in value, and be a princely fortune to the descendants of his sons, even divided amongst them all. He anticipated that the accrued shares would be large. When he excluded Joseph from any part of his residuary estate, he thought it proper to give a reason for it. That reason was not that he had preferred Joseph or his children in any previous disposition of

10 P. F. Smith—19

[Horwitz *v.* Norris.]

his will, but because he had made advances to him in his lifetime; a reason which shows, if anything was needed to show, that subject to his intention to give Fair Hill to his sons and Sepviva to his daughters and their descendants respectively, his primary and governing thought was equality among their families.

THOMPSON, C. J.—I concur in this opinion.